## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00662 (PLF)** |
| **v.** | : | |
| | : | |
| **WILLARD JAKE PEART,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Willard Jake Peart ("Peart") to thirty days incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

### I.     Introduction

"I don't know what would have happened if I had seen Mitt Romney. It's probably a good thing that I didn't see him, because I would have been, who knows, I was definitely, um ya know, there. I've never had that much adrenaline run through my body ever, um so I don't know, …" and "I'm glad it ended the way it ended." This was Willard Jake Peart's admission to FBI when asked if he went inside of the Capitol to harm politicians on January 6, 2021.

The defendant, Willard Jake Peart, a real estate agent and entrepreneur, knowingly and willfully participated in the January 6, 2021, attack on the United States Capitol – a violent attack that forced an interruption of the Congressional certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more

than one hundred police officers, and resulted in more than 2.7 million dollars in losses .[1]  Peart

pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or

Picketing in the Capitol Building.  As explained herein, a sentence of fourteen days incarceration

and 36 months' probation, is appropriate in this case because1) despite learning that the United

States Capitol Building had been breached and knowing that protesters were already inside the

building, Peart went to the Capitol; (2) upon arriving at the Capitol, Peart urinated on a wall near

the south west Capitol Reflecting Pool; (3) before entering the building, Peart observed numerous

signs of lawless conduct by others, including overrun police barricades, the odor of tear gas, broken

doors and windows on the exterior of the Capitol, the sound of blaring sirens, and a crowd of

rioters near the entrance to the Capitol doors who pushed against and ultimately breached a line of

police officers to gain entrance to the Capitol; (4) Peart climbed several scaffolding platforms

erected near the inauguration stage to gain access to an entrance of the building; (5) Peart observed

police officers retreating from the northwest entrance after being overcome by the mob of rioters;

(6) while approaching the entrance to the Capitol, Peart saw another rioter attempting to lift a

wooden board and assisted him before continuing to walk towards the Capitol's entrance; while

inside of the Capitol, Peart exclaimed at one point, "Where are the senators?", then chanted the

name of U.S. Senator Mitt Romney; (7) Peart saw rioters who had grabbed pepper spray cannisters

belonging to police officers, spray the officers with pepper spray; (8) Peart repeatedly refused to

leave the Capitol when ordered to do so by police officers who were  attempting to remove the

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States
Capitol exceeded 2.7 million dollars. That amount reflects, among other things, damage to the
United States Capitol building and grounds and certain costs borne by the United States Capitol
Police.

mob of rioters from the building; but (9) Peart turned himself in to the FBI before a warrant was issued for his arrest and has expressed remorse for his conduct on January 6.

The Court must also consider that Peart's conduct  on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Peart's participation in a riot that actually succeeded in halting the Congressional certification renders a sentence of thirty days incarceration, 36 months' probation, 60 hours of community service, and $500 restitution appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the Capitol. *See* ECF 31 (Statement of Offense), at 1-5. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Peart's conduct and behavior on January 6.

### Willard Jake Peart's Role in the January 6, 2021 Attack on the Capitol

Peart, traveled to Washington, D.C. from Utah with friends to hear then-President Donald J. Trump speak at the January 6, 2021, rally. ECF 32 ¶ 16. He claimed that he believed that the

2020 presidential election was fraudulent and described himself as passionate about the country and its freedoms.

Upon arriving in Washington, D.C., Peart and his friends attended the rally as planned. After the rally, Peart and his friends walked along Constitution Avenue and Pennsylvania Avenue. While sightseeing, Peart and his friends learned that rioters had breached the Capitol and were inside of the building.  Peart and his friends then walked to the Capitol.

In his FBI interview, Peart admitted that upon arriving  at the Capitol, he urinated  on a wall near the southwest Capitol Reflecting Pool. While outside the Capitol, Peart observed a number of metal barricades and a crowd of rioters pushing and breaching police lines..  Despite that,  he and his friends approached the crowds outside of the Capitol near the southwest corner of the Capitol by the House of Representatives Chamber. Using his cellular telephone, Peart proudly photographed himself standing outside of the Capitol.  *See* Image A. Peart was attired in a dark colored jacket, jeans, and beanie cap.



*Image A*

Deciding that he wanted to enter the Capitol, Peart left his friends and began to search for

a point of entry. He climbed on walls and scaffolding near the inauguration stage in an attempt to reach the Capitol building, eventually reaching the northwest side of the building.

While ascending steps of the building, Peart admitted that he saw a rioter attempting to lift a large two-by-four foot wooden board. ECF 32 ¶ 24. Peart assisted the rioter lift the wood before continuing to walk in the direction of the Capitol's entrance. *Id*. Peart later claimed he did not know what the rioter did with the large piece of wood.

Exterior surveillance cameras captured Peart standing outside of the Capitol. *See* Image B.



*Image B*

Upon arriving near the exterior doors of the northwest side of the building, Peart smelled the tear gas used by police officers to attempt to disperse the mob of rioters. Overwhelmed by the smell of the tear gas, Peart placed a surgical mask on his face.

Peart observed numerous police officers attempting to use spray tear gas in the direction of the rioters. Eventually, unable to control the growing crowd, officers began to retreat. Peart saw rioters who had grabbed the tear gas cannister spraying the officers with gas. Peart claimed he did not participate in the assault of the officers and attempted to remove bottles of pepper spray so

5

they would not fall into the possession of the rioters. Nevertheless, he continued to make his way into the Capitol.

Peart observed a line of police officers attempting to stop a mob of rioters attempting to enter the northwest side of the Capitol. The crowd, chanting and yelling outside of the building, was overtaking the line of officers. From Peart's location, he could clearly see officers being overwhelmed. Peart also observed damage done to doors and windows to the Capitol. Ignoring all that he saw and heard, including alarms blaring from inside the Capitol, Peart stood close behind the crowd of rioters attempting to enter the Capitol. Eventually the police line was breached. The mob of rioters flooded into the northwest side of the Capitol, accessing the building through the broken door and windows. *See* Images C and D.



*Image C*



*Image D*

Closed Circuit Video (CCV) cameras captured Peart entering the Capitol.  CCV cameras recorded Peart as he made his way through the building.  Peart entered the Capitol near the Senate Wing Door, approximately ninety seconds after rioters forced their way through the northwest entrance.  *See* Images E and F.



*Image E*



*Image F*

Upon entering the Capitol, Peart joined in the chorus of rioters as they chanted "Whose house? Our house!" ECF 32 ¶ 17.  Peart observed a nearby broken piece of furniture. *Id*.  Peart added to the commotion by banging on the broken item while continuing to chant. *Id*.  Peart paraded inside of the Capitol while in possession of the flag. *Id*.  Peart entered the Rotunda where he observed numerous police officers.  While inside the Rotunda, Peart continued to chant. *Id*.  At some point, Peart chanted loudly, "Where are the senators?" *Id*.  Peart specifically called out the name of U.S. Senator Mitt Romney. *Id*.

While inside, Peart walked between the Senate Chamber and Statuary Hall, making his way from the Senate side of the Capitol Building to the House side, eventually arriving at the House Wing Door. ECF 32 ¶ 18.  By this point, Peart had removed his jacket and hat. *See* Image G.



*Image G*

Upon reaching the Hall of Columns, Peart observed United States Capitol police officers and FBI SWAT agents standing in the hallway. *Id*.   See Image H. Peart continued to chant with rioters who were also parading through the hallway.  While chanting, a Capitol police officer asked Peart to leave.  *Id*.  Peart refused. *Id*.



*Image H*

An officer asked Peart a second time to leave the Capitol.  The officer guided Peart near the direction of the nearby exit by following closely behind Peart.  Peart began to walk towards the exit, but not before stating, "I want to go back." *Id*.  For a third time, Peart was told that he needed to exit the building. *Id*.  The officer continued to follow closely behind Peart as the officer walked Peart closer to the exit. *Id*. *See* Image I.



*Image I*

Peart finally complied and exited the Capitol. *Id*. *See* Images J and K.



*Image J*



*Image K*

Peart was inside of the Capitol for approximately thirty minutes.  After leaving the Capitol, Peart reconnected with his friends, then returned to his hotel room.  Peart flew back to Utah on January 7, 2021.

*Social Media Posts*

In the aftermath of January 6, the FBI obtained social media records from Peart's Facebook account with the handle name "Jake Peart." ECF 32 ¶ 56. On January 6, Peart shared the selfie photograph (*Image* A) that he took while standing outside of the Capitol.  Peart did not post any additional pictures to social media or post any commentary about January 6.  Peart shut down his Facebook page on January 20, 2021 after meeting with FBI agents. *Id*.  The FBI was able to review his Facebook page before Peart shut it down.  While Peart had additional social media accounts, a public search of the accounts did not reflect any postings related to January 6 by Peart after January 6. *Id*. Additionally, Peart did not post any content prior to January 6 related to that day. *Id*.  Peart cooperated with the FBI by providing agents with all of his social media accounts during his January 20, 2021 voluntary interview. *Id*.

*Peart's Interview*

After returning to Utah, Peart grew increasingly concerned about his unlawful entry inside of the Capitol. Peart's counsel contacted the local  FBI field office and informed agents that Peart wanted to self-surrender and admit that he had entered the Capitol on January 6.  On January 20, 2021, agents met with Peart at the local FBI field office with his counsel.  Peart  admitted entering the Capitol and provided the agents with a detailed itinerary beginning with his travel to Washington, D.C. from Utah to attend the Trump rally and his attendance at the rally.  Peart admitted he knew about the breach of the Capitol prior to going to the Capitol.  Peart described his actions upon arriving at the Capitol.  He admitted that he saw rioters using tear gas against the police.  He detailed seeing numerous police lines overwhelmed and broken by rioters attempting to enter the Capitol.  He admitted seeing numerous broken windows and doors of the Capitol. And that he helped another rioter pick up a two-by-four foot wooden board..  He also admitted seeing

the broken piece of furniture inside of the Capitol and banging on that item when he entered the building. Peart also detailed his entry inside of the Capitol, beginning with him climbing scaffolding and chanting inside the Capitol. Peart admitted to yelling out Senator Romney's name while asking where the U.S. senators were located. When asked if he went inside of the Capitol with the intent to harm politicians, Peart stated: "I don't know what would have happened if I had seen Mitt Romney. It's probably a good thing that I didn't see him, because I would have been, who knows, I was definitely, um ya know, there. I've never had that much adrenaline run through my body ever, um so I don't know, …" and "I'm glad it ended the way it ended."

Peart expressed regret for his conduct on January 6 and agreed to meet with agents after their initial meeting if agents had additional questions.

After interviewing Peart, agents reviewed surveillance footage from January 6 and confirmed that Peart did indeed enter the Capitol on January 6. Additionally, based on Peart's detailed information, agents were able to confirm that Peart provided credible information regarding his conduct and whereabouts inside of the Capitol.

In his February 7, 2022, interview with the U.S. Probation Office, Peart again expressed his remorse by stating that he should not have gone inside of the Capitol. Peart reiterated that he turned himself into FBI because he expected to be held accountable for his actions.

*The Charges and Plea Agreement*

On November 9, 2021, Peart was charged in a one-count Information with violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. On January 12, 2022, Peart pled guilty to the Information. By plea agreement, Peart agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Peart now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Peart faces up to six months of imprisonment and a fine of up to $5,000. Peart must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

In this case, as described below, the Section 3553(a) factors weigh in favor of a period of incarceration, as opposed to a sentence of probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with police officers and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Peart's individual conduct and determining a fair and just sentence, this Court should address a spectrum of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Peart personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. That Peart did not engage in violent or destructive acts is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Peart from most other misdemeanor defendants.

Prior to arriving at the Capitol, Peart knew that the Capitol has been breached and that protestors had unlawfully entered the building.  Despite having this information, Peart changed

course and decided to go in the direction of the chaos and the mayhem, and ultimately a dangerous situation that would overwhelm and endanger police and result in destruction and damage to the Capitol building.

Upon arriving at the Capitol, Peart arrived on the west side of the Capitol where a large number of protestors were concentrated.  Peart would have observed not only a large crowd of rioters but barricades signaling to those rioters that they were prohibited from unlawfully entering the Capitol, which was closed to the public on January 6.  Peart disregarded these observations and made his way to the Capitol building, urinating on the exterior building prior to climbing a nearby wall and scaffolding to make his way up to the Capitol Building.

While Peart did not personally engage in the physical assault of police on January 6, he certainly observed assaults on police and continued forward.  Peart admitted seeing rioters spraying police officers after they captured the gas cannisters.  Peart observed a bag containing two cannisters of pepper spray.  Observing police using pepper spray against the rioters and then seeing rioters turn the tables and spraying officers should have further signaled to Peart that his entry into the Capitol would only frustrate the efforts to prevent the breach of the Capitol. Nevertheless, Peart continued to press forward into the building.

Peart's entry into the Capitol occurred shortly after a breach of the police line located at the northwest entrance near the Senate Chamber.  Peart would have observed the burgeoning crowd of rioters pressing against the line minutes before the breach.  Peart also admitted that he helped another rioter pick up a two-by-four foot wooden board.  Yet, he remained focused on his intention to enter the building while rioters pushed their way into the Capitol by overriding the police line, bursting through the doorway and nearby windows.

After entering the Capitol, Peart exclaimed and celebrated his entry into the building by chanting phrases such as "Whose house? Our house!"  Peart observed a piece of broken furniture and began to pound on it while chanting.  And while the government has no evidence that Peart destroyed any property inside of the building, he admittedly saw the damage caused by others.  As Peart continued to make his way on the building's first floor, he joined in with the crowd as they yelled and called for the whereabouts of U.S. senators.  Peart, a resident of Utah, called out for the presence of Utah Senator Mitt Romney.  In his statement to FBI, Peart provided a concerning statement about whether he would have harmed Senator Romney if he had witnessed his presence inside of the building.

Peart defiantly left the Capitol only after traveling from the Senate side to the House side and encountering police officers..  Only after being instructed three times by an  officer that he needed to leave did Peart do so.  Peart exchanged words with the officer and was eventually led out of the Capitol by the officer, who took Peart by the arm and led him towards the Capitol's exit.

 Nor did Peart initially appreciate the gravity of his conduct.  After leaving the Capitol, Peart posted a picture of himself standing outside of the Capitol to his personal Facebook account.

Peart has since expressed remorse and contrition for his actions on January 6.  Fourteen days after the riot, Peart removed his Facebook post and turned himself into the FBI.  Peart had not been identified by law enforcement officials at that time.  As such, he notably and voluntarily admitted his conduct without law enforcement intervention.  During his interview, Peart was fully cooperative as demonstrated by him detailing his actions on January 6.  Peart has also expressed concern for how his actions affected individuals who worked inside the Capitol on January 6. The government has taken that into account in formulating its sentencing recommendation in this case.

Based on the totality of Peart's conduct on January 6, and his expression of remorse, the nature and the circumstances of this offense establish the need for a brief sentence of incarceration in this matter.

**B.      Peart's History and Characteristics**

Peart, a married father of five, resides in Utah with his family and works as a real estate agent/broker and entrepreneur.   ECF 32 ¶ ¶ 50, 61-63.   Peart does not have an adult criminal history. ECF 32 ¶ 39.

Peart has a limited social media presence. ECF 32 ¶ 56.   On January 6, Peart had multiple social media accounts, including one on Facebook. *Id.*  Peart posted only one picture of himself to his Facebook account after he left the Capitol.  Peart closed his social media accounts after meeting with FBI agents, but voluntarily provided information about his social media accounts therefore allowing FBI to review his accounts and confirm that Peart did not post any January 6 related postings prior to or after (albeit the one posting previously mentioned) January 6.  *Id.*

As it relates to his conduct since January 6 while on pretrial release, Peart has been compliant with the terms of his release. ECF 32 ¶  7.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of

_____

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight     and     Reform     Committee     (June     15,     2021),     available     at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Peart appears to acknowledge the full scope of his conduct.  Additionally, Peart's limited conduct on social media after January 6 supports the government's belief that Peart understands the seriousness of his conduct.

### E.    The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

not become the default.[4] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

Peart has pleaded guilty to a one count Information charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted

---

[4]   Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.   *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed in  other riot cases when fashioning a sentence in this case. In *United States v. Robert Bauer*, 21-cr-049-TSC, two days after his unlawful entry inside of the Capitol, Bauer voluntarily spoke with two FBI agents. During the interview, Bauer said that as he walked up to the Capitol building from Pennsylvania Avenue, he saw bicycle racks turned upside down and "there were people hanging off the scaffolding already." Despite the obvious chaos and rioting, Bauer made his way to the Capitol. Prior to entering, Bauer saw police officers armed with weapons.  Bauer observed rioters throwing

objects at the officers.  Bauer yelled at the rioters, telling them to stop throwing objects at the officers.  Despite seeing the assault of officers, which also included seeing officers be sprayed with pepper spray by the rioters, Bauer went into the Capitol, entering at the northwest side of the building, in a doorway near the Senate Wing Door.  While inside, Bauer walked around, going into the Crypt.  Bauer chanted inside, "Stop the Steal," alongside the crowd of rioters.  Bauer was inside of the Capitol for approximately 17 minutes.  The Court sentenced Bauer to a period of incarceration of 45 days of incarceration.

Bauer and Peart accepted responsibility early on, avoiding an extended prosecution and admitting their guilt early.  Both entered the Capitol through the Senate Wing Door following the breach of the police officer line.  Like Bauer, Peart observed the physical damage that occurred at the northwest side of the building.  Both observed assaultive conduct directed towards police officers, specifically, both observed officers being sprayed by pepper spray.  Unlike Bauer, Peart does not have an adult criminal history.  In *Bauer*, the Court did consider the fact the Bauer had an extensive adult criminal history.

While there are a number of aggravating factors for this Court to consider in addition to the aforementioned factor of Peart witnessing violence towards police officers, another significant factor that this Court should give significant weight too is the fact that Peart disregarded police orders in failing to leave the Capitol when initially asked.  In similar cases where rioters refused to heed to requests that they leave the Capitol, Court have imposed sentences of incarceration. *E.g., United States v. Bradley Rukstales*, 5:21-cr-00041(CJN); *United States v. William Tryon*, 1:21-cr-00420 (RBW); *United States v. Robert Reeder*, 1:21-cr-166 (TFH); *United States v. Joshua Wagner*, 1:21-cr-310-1 (ABJ); and *United States v. Jeffrey Register*, 1:21-cr-00349 (TJK).

*United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF)

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

26

**A. A sentence imposed for a petty offense may include both incarceration and probation.**

*1. Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[5] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[6] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

---

[5] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

[6] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2. Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by

probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).   In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.   S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.   But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."   18 U.S.C. § 3561(a)(3).   Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).   *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."   18 U.S.C. § 3561(a)(3).   Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."   *Little*, 2022 WL 768685, at *4.   But that limitation "does not extend" to a defendant sentenced to a petty offense.   *See id.*

("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress

enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense

case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Peart pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty

offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### 1. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983

WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two." *Id.*[7]

### A. *Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[7] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[8]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in Peart's case given the requested 30-day imprisonment sentence.

---

[8] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Willard Jake Peart to  thirty  days incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

<div style="margin-left:auto">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      _____
         BRITTANY L. REED
         LA Bar No. 31299
         Assistant United States Attorney (Detailee)
         U.S. Attorney's Office
         650 Poydras Street, Ste. 1600
         New Orleans, LA 70130
         Office: 504-680-3031
         Brittany.Reed2@usdoj.gov

</div>